# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| Z.F., AN INFANT, BY HIS NEXT FRIEND, ALFRED FLEMING, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:18CV00042 |
| v. | ) ) | **OPINION AND ORDER** |
| RYAN ADKINS, | ) ) ) | By: James P. Jones<br>United States District Judge |
| Defendant. | ) ) | |

*Michael A. Bragg*, BRAGG LAW, Abingdon, Virginia, and *Daniel B. Rice and Nicolas Y. Riley*, INSTITUTE FOR CONSTITUTIONAL ADVOCACY & PROTECTION, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C, for Plaintiff; *Henry S. Keuling-Stout*, KEULING-STOUT, P.C., Big Stone Gap, Virginia, for Defendant.

In this claim under 42 U.S.C. § 1983, the plaintiff, a minor child, alleges that his constitutional rights were violated by the defendant, a School Resource Officer, in his use of excessive force to seize the child's cellphone during an investigation at a middle school into the alleged distribution of nude photographs of a fellow student. The plaintiff and the defendant have each moved for summary judgment. I find that the evidence presents genuine disputes of material fact as to the excessive force claim and that the defendant is not entitled to qualified immunity. Accordingly, I will deny both the defendant's and the plaintiff's respective Motions for Summary Judgment and permit a jury to decide the defendant's liability.

I.

The facts, as shown in the extensive summary judgment record, are as follows.

Z.F. was a student at a public middle school located in this judicial district. On the date of the events in question Z.F. was 14 years old. Ryan Adkins, the defendant, was a School Resource Officer and Deputy Sheriff. The impetus for the confrontation between the two was the alleged circulation of a young female student's nude photo to other students without her consent through the social media application Snapchat.[1]

On April 17, 2018, the school's guidance counselor, Stacey Nichols, advised Officer Adkins that she had been informed by a student that another student's nude photos were being circulated through an unknown Snapchat account. Adkins interviewed the victim. The victim claimed that she had only sent the nude photos to Z.F. while they were dating, and that she had never sent the photos to other people. Adkins secured the victim's cellphone, and decided to obtain Z.F.'s cellphone in order to further investigate the allegations. Adkins has acknowledged that he did not have probable cause to arrest Z.F. at this stage, but the parties agree that he did have legal justification to seize Z.F.'s cellphone.

---

[1] Snapchat is a smartphone application that allows users to send photographs or videos with added special effects — such as captions, filters, or stickers — to other users. One of the defining features of the application is that the pictures and messages sent through it are usually available for only a short period of time before they become inaccessible to the recipients.

Different stages of Adkins' encounter with Z.F. were captured by the school's video surveillance cameras, although no audio accompanies these videos. Z.F. was in the school's cafeteria eating with other students when Adkins walked up to his lunch table. Adkins initiated the conversation, accompanied by an unidentified school administrator, by demanding Z.F.'s cellphone. Z.F. requested more information, which Adkins refused to provide beyond his explanation that it was for "an investigation." Mem. Supp. Pl.'s Mot. Summ. J. Ex. 5, Adkins Dep. 37, ECF No. 32-5. Z.F. refused to provide his cellphone.

At that point Adkins pulled Z.F. away from the cafeteria table by his jacket into the front hallway of the school, and again demanded Z.F.'s cellphone. Z.F. claims he told Adkins to call his father, because he had been instructed by his parents to ask for his father if he "ever felt uncomfortable around a police officer." *Id*. at Ex. 1, Z.F. Decl. 2, ECF No. 32-1. Adkins disputes that Z.F. ever mentioned his father or the desire that he be called.

The video surveillance cameras captured much of the remainder of the interaction from two different angles. Shortly after entering the hallway, Z.F. walked away from Adkins, Principal Greg Jessee, and Nichols, and towards the school's front office. Adkins grabbed Z.F.'s arm to stop him, but Z.F. shook him off and continued walking toward the front office while pulling out his cellphone. Adkins claims that he told Z.F. to stop when he started to walk away, but Z.F.

disputes being told to stop.  Within the span of a few seconds, Adkins came behind Z.F. and wrapped both arms around him.  Adkins then pushed Z.F. into the hallway's door, dragged him back into the hallway, and onto the floor.  At this stage, three different school administrators were in the hallway, as well as an unidentified female student.  Adkins kept Z.F. pinned down for approximately twenty seconds with an elbow at his neck and a knee on his back while he searched Z.F. for his cellphone.

After seizing the cellphone, Adkins escorted Z.F. to an office.  Principal Jessee subsequently called Z.F.'s mother to notify her of the accusations against her son and to request her consent to Adkins' search of Z.F.'s cellphone.  Z.F.'s mother arrived at the school and consented to Adkins' search of the cellphone. No nude photos were found.  Z.F. claims that he deleted the victim's nude photos immediately after he had received them, and that he no longer possessed them when they were circulated on Snapchat.  Adkins ceased his investigation, and the actual distributor of the photos has not been identified.

A day after the incident, Z.F. complained of dizziness, nausea, headaches, and back and shoulder pain.  His parents took him to a local hospital, where Z.F. was diagnosed with a likely concussion and muscle strain in his back.  In addition to his physical injuries, Z.F. began to experience anxiety and panic attacks.  He has been prescribed medication for his anxiety and depression and has attended therapy.

Following the close of discovery, the parties have each moved for summary judgment. The motions have been fully briefed and are ripe for decision.[2]

II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3] In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The substantive law applicable to the case determines which facts are material. *Anderson,* 477 U.S. at 248. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986). If the moving party makes that showing, the nonmoving party must then produce admissible evidence — not mere allegations or

---

[2] Oral argument is not necessary due to the thorough written arguments of the parties and the volume of discovery materials provided to the court.

[3] I have omitted internal quotation marks, alterations, and citations throughout this opinion, unless otherwise noted.

denials — establishing the specific material facts genuinely in dispute. Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Rules of Evidence apply in connection with summary judgment practice. *See* Fed. R. Civ. P. 56(c)(4). Consequently, the court may not consider inadmissible evidence in connection with summary judgment motions. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (affirming striking of statements that were hearsay, irrelevant, or conclusory). The court does not weigh evidence, consider credibility, or resolve disputed issues — it decides only whether the record reveals a genuine dispute of material fact. *Anderson*, 477 U.S. at 255. Yet as the Supreme Court noted in *Scott*, courts cannot rely on a party's version of events when they are discredited by the record. 550 U.S. at 378–79. As in *Scott*, there is video footage of much of the events in question, and I must view the facts in the light undisputedly depicted by that video. *Id.* at 379.

Z.F. has withdrawn his unreasonable search and seizure claim, leaving two issues to be decided, with the first being whether Adkins used excessive force when he tackled Z.F.[4] The second is whether Adkins is entitled to qualified immunity.

In his summary judgment motion, Z.F. argues that Adkins used excessive force in order to seize his cellphone. Z.F. claims that he was not a threat nor resisting

---

[4] Z.F. concedes that Adkins had justification to seize and search his cell phone and has, therefore, withdrawn his first claim for § 1983 relief. Consequently, I will not address Adkins' arguments regarding the seizure of the cellphone.

arrest when Adkins tackled him, so that Adkins' force was objectively unreasonable. Z.F. also argues that his age and the school context made the use of force particularly unreasonable. He further emphasizes a number of Fourth Circuit cases involving use of force against children while at school to demonstrate that the law was clearly established at the time of the incident, so that a reasonable officer would have known his actions were unconstitutional and Adkins should not be entitled to qualified immunity. Adkins contends that his force was not excessive and was justified due to Z.F.'s noncompliance during the investigation, and Adkins' belief that Z.F. was trying to leave the school and delete the incriminating photographs from his phone.

### A. Excessive Force.

The Fourth Amendment's prohibition on unreasonable seizures "bars police officers from using excessive force to seize a free citizen," *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003), and this applies equally to the conduct of resource officers in schools, *see E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018). Whether an officer has used excessive force is analyzed under an objective reasonableness standard. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Determining the reasonableness of an officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015). Police officers' actions must be examined "in light

of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The *Graham* Court set forth three factors to consider, with the first being the "severity of the crime at issue." *Id*. at 396. Second is whether the suspect poses an "immediate threat to the safety of the officers or others." *Id*. Finally, it must be considered whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Id*.

These factors are not "exclusive," and other "objective circumstances potentially relevant to a determination of excessive force" may be considered. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). In a case such as this, it is also appropriate to consider the minor's age and the school context. *See E.W. ex rel. T.W.*, 884 F.3d at 179.

As for the first *Graham* factor, Adkins is correct that he was investigating a serious potential criminal offense, specifically felony possession and distribution of child pornography. *See* Va. Code Ann. § 18.2-374.1:1 (classifying as Class 6 felony offense). While child pornography is damaging to our society and harmful to its victims, the facts known to Adkins at the time he confronted Z.F. did not indicate a violent crime or a propensity for violence by Z.F.

As for the second factor, Adkins has presented no evidence that Z.F. was suspected of being armed or posing a viable threat. *See Jones*, 325 F.3d at 528–29 (holding that plaintiff did not pose an immediate threat to the defendant officer

because he "was neither armed *nor suspected of being armed*" and he was in a separate room from the public); *E.W. ex rel. T.W.*, 884 F.3d at 180–81 (holding that a calm, compliant elementary school child without weapons and surrounded by school administrators and a deputy sheriff was not a threat under the second and third *Graham* factors, and noting that the child had no prior behavioral issues, so that handcuffing the child was objectively unreasonable).

Adkins also suggests that Z.F. was unusually large for a 14-year-old — Z.F. was approximately six feet and 212 pounds at the time — and posed a risk to him for that reason. However, a jury might find that Adkins' law enforcement training, larger size, the presence of numerous school administrators, Z.F.'s relatively calm demeanor, and Z.F.'s lack of a negative behavioral history reduced any such risk. *See Id.* at 181. In addition, Adkins has admitted that he did not feel threatened by Z.F. during their conversation; he simply did not like Z.F.'s noncompliance and what he perceived as a "hateful manner." Adkins Dep. 42, ECF No. 32-5.

As for the third *Graham* factor, it is undisputed that Z.F. was not cooperating with Adkins and his investigation. However, the Fourth Circuit has noted that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a seizure. *See Graham v. Gagnon*, 831 F.3d 176, 187 (4th Cir. 2016) (noting that failing to cooperate is not a direct act of resistance).

Adkins raises five points that relate to *Graham*'s third factor. First, Adkins maintains that Z.F. did not tell him that he was calling his father before he walked away from the discussion. Second, Adkins asserts that he ordered Z.F. not to walk away, but Z.F. disagrees.[5] These are genuine disputes of material fact that cannot be gleaned from the video footage and there is no audio available that might have captured their conversation, so they are matters for the jury to consider. Third, Adkins claims that Z.F. was walking towards the building's exit when Adkins decided to use force because he assumed that Z.F. was attempting to leave the school and delete the relevant evidence from his cellphone.[6]

Fourth, Adkins argues that Z.F. pulled him out the door while the officer was trying to physically gain control over him and that he did not push Z.F. Once again, the security video appears to refute Adkins' assertions. Finally, Adkins argues that he did not put his full weight on Z.F. or stay on top of Z.F. for more than a few seconds. However, the video shows that Adkins stayed on Z.F for approximately 20

---

[5] Adkins grabbed Z.F.'s arm when Z.F. first tried to walk away, but Z.F. pulled away from him. Adkins includes this instance of noncompliance as another justification for his use of force, but the Fourth Circuit recently reaffirmed that the "initial act of pulling [one's] arm away" when an officer grabs a person "without warning or explanation" does not justify the officer's decision to throw that person to the ground. *Hupp v. Cook*, 931 F.3d 307, 323 (4th Cir. 2019). Adkins claims he told Z.F. not to walk away when he took Z.F. into the hallway, but Z.F. contests this and there is no audio in the video to clarify the matter.

[6] However, the surveillance camera footage indicates that Z.F. was not walking toward the door.

seconds while he attempted to obtain the cellphone.  Adkins admits that Z.F. had stopped struggling once he had been forced to the ground.

I find that Z.F. has proffered sufficient evidence that Adkins used excessive of force to survive summary judgment.  While the plaintiff has made a strong case that Adkins' conduct constituted a constitutional violation as a matter of law, it is necessary to "assess the objective reasonableness of force . . . in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).  There is evidence that, if believed by a jury, might convince it that the totality of the circumstances justified Adkins' conduct.  I thus find it appropriate that a jury determine the factual issues supporting the claim in this case.

## B. Qualified Immunity.

Qualified immunity shields government officials from liability in a § 1983 suit so long as their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To determine whether an officer is entitled to qualified immunity, I must examine whether (1) the plaintiff has demonstrated that the officer violated a constitutional right, and (2) that right was "clearly established at the time of the alleged violation." *Estate of Armstrong ex rel. Armstrong v. Vill.*

*of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016). To defeat the officer's entitlement to immunity, the answer to both questions must be in the affirmative. *Id.*

The first step is fact-intensive and can be determined by the judge at the summary judgment stage or by the jury if the matter goes to trial, whereas the second step is "always a matter of law for the court." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). The Supreme Court and Fourth Circuit have held that the violated right need not have already "been recognized by a court in a specific context before such right may be held clearly established for purposes of qualified immunity." *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (rejecting proposition that qualified immunity is unavailable only if the very action in question has previously been held unlawful). Thus, the absence of a judicial decision specifically holding that it is unlawful to tackle a child who refuses to comply with a lawful order to turn over his cellphone does not preclude denial of a qualified immunity defense. *See Wilson v. Layne*, 526 U.S. 603, 614–15 (1999).

There are two Fourth Circuit decisions that are relevant to whether Adkins is entitled to qualified immunity. The first involves the use of force against children in school, while the second address the use of tackling and pinning down relatively compliant suspects when there is not probable cause to arrest. *E.W. ex rel. T.W.*, 884 F.3d at 180–81; *Smith*, 781 F.3d at 102–03. The facts in *E.W. ex rel. T.W.* are like

this case but with two important distinctions, namely the greater degree of force used against Z.F. and the less violent offense being investigated by Adkins. The *E.W.* case involved a ten-year-old girl who had been in a fight with another elementary school child on the bus. School officials waited three days before contacting the school resource officer and then pulling E.W. out of class to discuss the incident with her. *E.W. ex rel. T.W.*, 884 F.3d at 176–77. During the conversation, with two school administrators present, the school resource officer handcuffed the young girl because the officer believed E.W. did not understand the seriousness of the situation.

The officer belatedly claimed concern that the girl might become violent, but admitted that she did not know if E.W. had a violent behavioral history and acknowledged that there were two school administrators in the room as well. The Fourth Circuit also noted that E.W. was four foot four inches tall and weighed 95 pounds, while the officer was five foot four inches and weighed approximately 155 pounds. The officer only decided to remove the handcuffs after she thought E.W. was properly remorseful because the young girl began to cry and promised she would not fight with other students again. The Fourth Circuit held that the officer's decision to handcuff the child, when E.W. was calm and relatively compliant, was objectively unreasonable. *Id.* at 180–82. The court placed significant weight on the fact that the seizure took place in the school and the young girl's age. *Id.* at 183–84. The court also emphasized that "officers should exercise more restraint when dealing

with student misbehavior in the school context," because the use of force "is counterproductive to the mission of schools and school personnel" — all of which weighed against the reasonableness of using handcuffs on E.W. *Id.* at 183–84.

The Fourth Circuit's holding in *Smith* is the second relevant decision, and it also demonstrates that the law was clearly established when Adkins confronted Z.F. The *Smith* case involved the search for a missing juvenile, in which the boy was observed in a home with a group of other young men. The officer knocked on the door and Smith answered the door. Smith was a 21-year-old woman of slight stature, whereas the officer was significantly taller and approximately 200 pounds. The officer instructed her to step outside. After answering a few of the officer's questions, she turned to go back inside to get a different individual that the officer had asked after. The officer "slammed the door shut," and when she took a step away from him, he grabbed her arm. *Smith*, 781 F.3d at 98. When Smith pulled her arm away and asked what he was doing while using a few expletives, the officer responded by grabbing the smaller woman and throwing her to the ground. "When she hit the ground, he jumped on her, jamming his full weight into her back with his knee, and painfully twisting her right arm behind her back." *Id*. After punching Smith in the side a few times to get her to release her left arm, the officer then handcuffed her and yanked her to her feet by her hair. A small pocketknife fell to the ground during the struggle, but Smith never attempted to use it nor struck out at

the officer, and the officer never explained that Smith was subject to an investigative detention or under arrest. *Id.* at 99.

The Fourth Circuit held that it was objectively unreasonable for the officer to tackle Smith and then pin her down while punching her to force full physical compliance. *Id*. at 103. The court also noted that the officer was not entitled to qualified immunity because the court's previous holding in *Rowland*, 41 F.3d at 171–174, was clearly established law when the officer tackled Smith. The Fourth Circuit also reasoned that Smith's motion to step away from the officer did not qualify as active resistance or evasion of arrest, nor did her efforts to pull her arm away from the officer or to keep an arm underneath her to be able to breathe. *Smith*, 781 F.3d at 103. Ultimately, the court held that "[g]iven the obvious excessiveness of the force [the officer] had employed up to that point, he cannot use her slight resistance to the attack to justify his escalation of the conflict." *Id.*

Although Adkins' investigation involved a more serious criminal offense, both involved nonviolent offenses that were "not of the type that would give an officer any reason to believe that [the person] was a potentially dangerous individual." *Id.* at 102. I find that these two cases demonstrate that a middle school student posing no imminent risk of harm has a right to be free from excessive force, and that the right was clearly established when Adkins used force against Z.F.

Accordingly, Adkins has not carried his burden to prove that he is entitled to qualified immunity.

III.

For the foregoing reasons, it is **ORDERED** that the Plaintiff's Motion for Summary Judgment, ECF No. 31, is DENIED, and the Defendant's Motion for Summary Judgment and Qualified Immunity, ECF No. 33, is also DENIED.

    ENTER: January 29, 2020

    /s/ *JAMES P. JONES*
    United States District Judge